UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
DEBRA G. ROWE,                      )
                                    )
            Plaintiff,              )
                                    )
     v.                             )   Civil Action No. 11-1914 (RMC)
                                    )
DISTRICT OF COLUMBIA, *et al.*,     )
                                    )
            Defendants.             )
_____ )

## MEMORANDUM OPINION

This matter is before the Court on Defendant District of Columbia's Motion to Dismiss Plaintiff's Complaint [Dkt. #15] and Plaintiff's Motion for Ammendment [sic] to Complaint [Dkt. #21]. For the reasons discussed below, the former will be granted, and the latter will be denied as futile.[1]

## I. BACKGROUND

Plaintiff "is a former employee of the District of Columbia Department of Health[,] HIV/AIDS Administration (DOH/HAA)." Compl. ¶ 4. In November 2004 she accepted the position of Acting Chief of Housing, *id.* ¶ 13, and undertook management of a program, Housing Opportunities for Persons with AIDS ("HOPWA"), *id.* ¶¶ 4, 13, which received grant funding from the United States Department of Housing and Urban Development ("HUD"), *see id.* ¶¶ 4, 9-11. HOPWA "encompassed the District of Columbia, Southern

---

[1] The Court will deny plaintiff's Motion for Oral Argument [Dkt. #24] as moot.

Maryland (Prince George[']s, Howard and Charles Counties), Northern Virginia and West Virginia." *Id.* ¶ 4.  Since April 2003, HUD representatives had expressed concerns about the District's "slow expenditure of HOPWA formula awards," which could have resulted in the de-obligation of funds if the District did not commit and expend funds within a set time period. *Id.* ¶ 9.  It appears that the selection of plaintiff to serve as Acting Chief of Housing occurred after "the previous director had jumped the ship," *id.* ¶ 12, leaving HOPWA without a manager.  In this capacity, plaintiff also served "as the Department of Corrections Liaison," *id.* ¶ 4, and "she chaired the DOC Comprehensive Continuity of Care Committee comprised of Government, Federal and non-profit organizations," *id.* ¶ 42.

Defendant David Catania ("Catania"), an At-Large member of the Council of the District of Columbia, was the Chair of the Council's Committee on Health. *Id.* ¶ 5.  At a hearing in November 2003, Catania notified plaintiff of his intention to spend "4 million dollars in the HAA Housing coffers." *Id.* ¶ 14.  Upon plaintiff's review of relevant "expenditure records, [she] informed [Catania] and his Policy Director Tori Fernandez Whitney that the funds could not be spent by the District [because they] belonged to two jurisdictions that were 'intra-district sub-grantees' of DOH/HAA (Prince George[']s County and Northern Virginia)." *Id.*  Apparently these jurisdictions had not spent their allotted amounts, but the period within which they were required to obligate and spend the funds had not expired. *See id.*  The District had spent its funds, "but had grossly not reconciled [its] funding for Fiscal Years (FY) 2001 thru [sic] the first quarter of FY 2005." *Id.*  "Plaintiff followed HUD's advice, hired [a] contractor and reconciled (expenditures, beneficiary data and community[-]based providers['] budgets) for each of those program years." *Id.*

According to plaintiff, Catania "was enraged by [her] explanation and consistently insisted that 'the funds be spent the way that he wanted,'" notwithstanding plaintiff's repeated assertions that spending the funds as Catania proposed would not comply with HUD regulations. *Id.* ¶ 15. By March 2006, Catania allegedly both "wanted the money and wanted [plaintiff] fired." *Id.* ¶ 16. Catania took action by way of budget legislation to effect the allocation of "$2 million of [HOPWA] resources . . . to expand the housing stock available to eligible persons living with HIV/AIDS in the District of Columbia," and an additional "$2 million . . . for the establishment of a long-term mortgage assistance program for eligible persons living with HIV/AIDS in the District of Columbia." *Id.* ¶ 18. The Director of DOH received a letter from HUD's Director of Community Planning and Development expressing concerns arising from the Council action, with a reminder to DOH/HAA "that . . . any substantial changes to the design of the city's HOPWA program would require an amendment to the city's Consolidated Plan and must be consistent with HOPWA program regulations." *Id.* ¶ 19.

Plaintiff received a telephone call from Whitney at Catania's behest and was asked "to come down to [C]ouncil chambers," at which time she was "questioned for nearly three . . . hours about the HOPWA program." *Id.* ¶ 20. Plaintiff characterized the meeting as an "inquisition." *Id.* By February 2007, "[t]he harassment became more consistent and unbearable," prompting her to seek the assistance of Congresswoman Eleanor Holmes Norton to whom she sent a letter expressing her concerns and requesting an investigation of "what [she] deemed . . . unethical practices" of Catania and Whitney. *Id.* ¶ 21.

Plaintiff obtained a copy of an email message dated February 5, 2007, from Bobbi Smith to Catania and Whitney with notice that "Plaintiff was about to blow the whistle on him."

3

*Id.* ¶ 22. The email also "contained an allegation regarding Plaintiff and the program Miracle Hands and others that were not mentioned by name and other allegations."[2] *Id.* This email apparently had been printed, copied, and distributed to plaintiff's colleagues in order "to defame her character," *id.* ¶ 23, and "was used as the basis for Miracle Hands to be raided." *Id.* ¶ 43.

Plaintiff believed that Catania "had intentions for . . . Whitney to become the Senior Deputy Director of DOH/HAA," and the arrangement only awaited confirmation by the Mayor. *Id.* ¶ 26. Plaintiff's letter to Congresswoman Norton, however, "put a cloud over that appointment," and, instead, "Whitney was appointed Senior Deputy Director of [the] Addiction[] Prevention and Recovery Administration." *Id.* Congresswoman Norton apparently referred plaintiff's letter to the Office of the Inspector General, *id.* ¶ 27, a representative of which interviewed plaintiff by telephone in May 2007, *id.* ¶ 28.

On September 19, 2007, about six months after plaintiff's letter to Congresswoman Norton, agents of the Federal Bureau of Investigation ("FBI") raided plaintiff's home. *Id.* ¶¶ 30-32. The agents arrived in "six . . . cars and four . . . SUVs which gave the appearance of a 'drug raid' to [plaintiff's] neighbors." *Id.* ¶ 43. Days later, she became aware of a rumor circulating that she had been arrested, that "the FBI raided her 'mansion on her ranch and her spanking brand new Mercedes was in the driveway' (none of which was true)." *Id.* ¶ 32. Bloggers and newspaper reporters contacted the Director of DOH for comment, *id.*, and a representative from the Office of the Mayor asked plaintiff "to 'explain her side of the story to

---

[2]     Miracle Hands was a service provider and recipient of DOH/HAA grant funds. *See* Compl. ¶¶ 43, 50. Miracle Hands apparently was thought to have used grant funds for the renovation of a warehouse, *see id.* ¶ 50, for use as a job training facility, *id.* ¶ 54. Cornell Jones was the Executive Director of Miracle Hands. *See id.* ¶¶ 4, 43. According to plaintiff, Jones "had been outspoken about some of [Catania's] tactics," and his "remarks inspired [Catania] to []target" both plaintiff and Jones. *Id.* ¶ 43.

him and to send him any relevant support[ing] documents that she had.'" *Id.*  Plaintiff complied. *Id.*

On October 22, 2007, Shannon Hader, the new Senior Deputy Director, *id.* ¶ 33, "reassigned [plaintiff] from her duties and basically 'stripped' her . . . of all of her responsibilities." *Id.* ¶ 34.  By December 2007, plaintiff "began to have frequent chest pain as she continued to work hard, try to maintain her faith in the system and to do the best that she could at her job, but the strain was too much."  *Id.* ¶ 38.  She suffered a heart attack on January 6, 2008, underwent surgery, and was instructed "to be off from work for approximately nine . . . weeks."  *Id.* ¶ 39.  Her requests for medical leave were denied.  *Id.* ¶ 40.

By early 2008, Gunther Freehill ("Freehill"), plaintiff's supervisor (mentioned by plaintiff in her letter to Congresswoman Norton) "became very hostile and began micro managing Plaintiff's work" and "undermining her professional relationships" with colleagues and community-based service providers.  *Id.* ¶ 29.  Plaintiff was terminated on April 8, 2008.  *Id.* ¶ 41.  Hader cited plaintiff's lack of "vision to move the program in [Hader's] direction," as well as "HUD audit findings" for fiscal years 2001 through the first quarter of 2005, "even though Plaintiff saved the program from being de-obligated of 27 million dollars by HUD."  *Id.*  According to plaintiff, she lost her job "for refusing [Catania's] requests and speaking up about the wrongdoing."  *Id.* ¶ 58.

Plaintiff claimed to have been "'blackballed' throughout D.C. Government and the community-based programs," and was unable to secure employment, notwithstanding "her longstanding professional relationships with them" through her chairmanship of the Department of Corrections' Comprehensive Continuity of Care Committee.  *Id.* ¶ 42.  For example, she was a

candidate for a position with the Department of Corrections, yet did not get the job after "DOC received an email from Shannon Hader" containing "a veiled threat" that hiring plaintiff would mean that DOH "would not do business" with Corrections any longer. *Id.* She believed "anyone who hired [her] under the health care umbrella would have [its] funding threatened by [Catania]." *Id*.

"Plaintiff was never charged with any wrongdoing." *Id.* ¶ 43. After the close of the FBI investigation, Catania allegedly "'recruited' the Washington Post into his vendetta and prompted [its] investigation into the HAA programs." *Id.* ¶ 44. A Washington Post reporter "was dead set on a negative portrayal of Plaintiff based on some hearsay of [Catania's] cohorts" whose identities the reporter refused to reveal. *Id.* ¶ 45. Plaintiff "could [not] appropriately respond" to the reporter's questions during an interview in June 2008 without knowledge of the reporter's sources. *Id.* An article published in October 2008 "made Plaintiff the scapegoat" for problems which had "plagued [the agency] for years." *Id.* ¶ 46. An article written by Jeffrey Anderson and published in August 2011 in The Washington Examiner contained similar "untrue statements . . . regarding Plaintiff," *id.* ¶ 47, and reported that plaintiff "work[ed] for a company – run by a former drug kingpin – that she funded as a city employee," that is, Miracle Hands. *Id.* And an article written by Freeman Klopott and published on August 30, 2011 in The Washington Times erroneously attributed to plaintiff a grant awarded to Miracle Hands for the renovation of a warehouse. *Id.* ¶ 50. Plaintiff disputed the content of these and other articles. *See id.* ¶¶ 51-52. And after "a very promising job interview the week prior to the Washington Post article," plaintiff received a telephone call from the prospective employer's Executive Director and was notified that the organization "could not hire her even though she really was the best candidate for the position." *Id.* ¶ 60.

6

Plaintiff dos not challenge her termination.[3]  Rather, she maintains that defendants' "defamation of her character has deterred her from securing meaningful employment in her field of expertise." *Id.* ¶ 58.  She attributes her inability to secure employment to defendants' actions which have "defamed [her] in the worst way." *Id.*  "Potential employers Google [plaintiff] and see the negative press." *Id.*

## II.  DISCUSSION

### A.  *Defendants In This Action*

The Court is mindful that plaintiff is not a lawyer and her pleading is not held to a standard otherwise applicable to a pleading prepared by a lawyer.  *See Haines v. Kerner*, 404 U.S. 519, 520 (1972).  Plaintiff's lack of legal training appears to have created some confusion as to the intended defendants in this action.

The Court construes the complaint as one bringing a civil rights claim under 42 U.S.C. § 1983, *see id.* ¶¶ 62-63 (Count I), and common law claims of defamation and intentional infliction of emotional distress ("IIED"), *see id.* ¶¶ 67-75 (Count II) and 77-80 (Count III), against the District of Columbia, David Catania, Gunther Freehill, Jeffrey Anderson and

---

[3]  Had plaintiff challenged her termination, it is probable that the Comprehensive Merit Personnel Act ("CMPA"), *see* D.C. Code § 1-601.01 *et seq.*, would apply, and that its provisions would deprive this Court of subject matter jurisdiction over any claim, including common law tort claims such as defamation and emotional distress, arising from her termination.  *See Robinson v. District of Columbia*, 748 A.2d 409, 411 (D.C. 2000) ("With few exceptions, the CMPA is the exclusive remedy for a District of Columbia public employee who has a work-related complaint of any kind."); *District of Columbia v. Thompson*, 593 A.2d 621, 635 (D.C. 1991) (holding that the CMPA "preclude[s] litigation of [the plaintiff's] emotional distress and defamation claims, in the first instance, in Superior Court").

Freemon Klopott.  The caption of the complaint, however, suggests a different interpretation.  It lists the defendants as follows:

> **DISTRICT OF COLUMBIA**
>
> **A Municipal Corporation**
> **Serve: DAVID CATANIA**
> 1350 Pennsylvania Ave.
> Washington, D.C., 20004
>
>     And
>
> **DISTRICT OF COLUMBIA**
> **A Municipal Corporation**
> **Serve: GUNTHER FREEHILL**
> 999 North Capitol Street, N.E.
> Washington, D.C., 20002
>
>     And
>
> **JEFFREY ANDERSON**
> 3600 New York Avenue, N.E.
> Washington, D.C., 20005
>
>     And
>
> **Freemon Klopott**
> 1015 15th Street, N.W.
> Washington, D.C. 20005
>
>     Defendants[.]

Compl. at 1 (caption) (emphasis in original).  As the caption is drafted, it appears to identify three defendants -- the District of Columbia, Jeffrey Anderson, and Freeman Klopott – and directs that service of process on the District of Columbia be effected by serving Catania and Freehill.  A fair reading of the complaint reflects plaintiff's intention to name Catania and Freehill as defendants to this action.  *See, e.g.,* Compl. ¶¶ 5-6 (respectively, referring to Catania as "Defendant 1" and Freehill as "Defendant 2").

On or about November 14, 2011, the Clerk of Court issued four summonses for three defendants: Anderson, Klopott, and the District of Columbia.[4] In this case, it appears that summonses for service on the District of Columbia identified David Catania and Gunther Freehill as the intended recipients – but neither is authorized to accept service on the District's behalf. *See* Mem. of P. & A. in Supp. of Def. District of Columbia's Mot. to Quash Pl.'s Proof of Service [Dkt. #5] at 6; Statement of P. & A. in Supp. of Def. David Catania's Consent Mot. to Quash Pl.'s Proof of Service [Dkt. #7] at 4. Service of process since has been effected properly on the District of Columbia. Catania, Freehill, Anderson and Klopott have not been served and no counsel has entered an appearance on behalf of these defendants.

"[F]ederal courts lack the power to assert personal jurisdiction over a defendant 'unless the procedural requirements of effective service of process are satisfied,'" *Mann v. Castiel*, 681 F.3d 368, 372 (D.C. Cir. 2012) (citing *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 514 (D.C. Cir. 2002)) (other citations omitted), and "such is so even if a defendant had actual notice," *DiLella v. Univ. of the Dist. of Columbia David A. Clarke Sch. of Law*, No. 07-0747, 2009 WL 3206709, at *1 (D.D.C. Sept. 30, 2009) (citation omitted). If a defendant has not been properly served, the Court "ordinarily would be powerless to proceed with the case" as against that defendant. *Williams v. GEICO Corp.*, 792 F. Supp. 2d 58, 66 (D.D.C. 2001) (citation omitted).

Here, plaintiff is proceeding not only *pro se* but also *in forma pauperis*. She may rely on the Clerk of Court and the United States Marshals Service to effect service of process on her behalf. *See* 28 U.S.C. § 1915(d); Fed. R. Civ. P. 4(c)(2). The Court ordinarily does not

---

[4] Because service on the District of Columbia requires service on both the Mayor and Attorney General of the District of Columbia, *see* Fed. R. Civ. P. 4(j)(2); Super. Ct. Civ. R. 4(j)(1), the Clerk ordinarily issues a separate summons for each official.

penalize a plaintiff for failing to effect service in a situation such as this by dismissing a complaint for insufficient or improper service of process without first allowing plaintiff the opportunity to assist the court officers with curing any service deficiencies. *See Moore v. Agency for Int'l Dev.,* 994 F.2d 874, 876 (D.C. Cir. 1993); *Dominguez v. District of Columbia*, 536 F. Supp. 2d 18, 23 (D.D.C. 2008). Even if the service deficiencies were cured, however, as the Court discusses below, there are independent bases on which to dismiss this complaint.

### B. *Plaintiff Fails to State a § 1983 Claim Against the District of Columbia*

Plaintiff purports to bring a claim against the District of Columbia under 42 U.S.C. § 1983, *see* Compl. ¶¶ 61-65 (Count I), which in pertinent part provides:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects . . . any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. In order to state a claim under § 1983 for a violation of a constitutional right, a complaint must allege facts sufficient to support a reasonable inference that (1) a person (2) acting under color of state, territorial, or District of Columbia law (3) subjected the plaintiff or caused the plaintiff to be subjected (4) to the deprivation of a right secured by the Constitution or laws of the United States. *See, e.g., City of Oklahoma City v. Tuttle,* 471 U.S. 808, 829 (1985). Here, plaintiff claims that she was denied "the forum that was available (a city council hearing or straight forward interview) necessary to address any signs of impropriety that have been repeatedly alleged from November 2005 to the present." Compl. ¶ 62. She further alleges that Catania "has a custom of vindictiveness and malicious vilification and slander," *id.* ¶ 63, and that

these defendants' actions were "taken in accordance with this policy, custom or practice," *id.* ¶ 65.

The District moves to dismiss the § 1983 claim because plaintiff "bases [it] on an interest that is not protected by the Constitution." Def.'s Mem. at 5. Noting the repeated references to defamation and damage to plaintiff's reputation throughout the complaint, the Court presumes that the interest plaintiff asserts is her reputation. A person's interest in her reputation is not a constitutionally protected interest, however. Defamation is a common law claim, which alone does not rise to the level of a civil rights claim over which this Court has subject matter jurisdiction. *See Paul v. Davis*, 424 U.S. 693, 712 (1976) ("Petitioner's defamatory publications[, distributing a flyer listing respondent as an "active shoplifter,"] however seriously they may have harmed respondent's reputation, did not deprive him of any 'liberty' or 'property' interests protected by the Due Process Clause.").[5]

If plaintiff were to proceed on a constitutional defamation claim, there are two theories on which she could rely. A "reputation plus" claim requires allegations of "defamation 'in the course of the termination of employment.'" *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998) (quoting *Paul,* 424 U.S. at 710). Alternatively, she could proceed on the theory that "the combination of an adverse employment action and 'a stigma or other disability . . .

---

[5] Even if plaintiff were to bring a civil rights claim against Catania in his individual capacity under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), the claim would fail. At most, Catania's statements defamed plaintiff and harmed her reputation in the eyes of then-current or prospective employers. "Defamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation." *Siegert v. Gilley*, 500 U.S. 226, 233-34 (1991). Because plaintiff's *Bivens* claim against Catania cannot survive, the Court will deny plaintiff's motion to amend the complaint, through which she purported to clarify that Catania is "to be named in his personal capacity." Mot. for Am. to Compl. [Dkt. #21] at 1.

foreclosed [the plaintiff's] freedom to take advantage of other employment opportunities.'" *Id.* at 1141 (quoting *Bd. of Regents v. Roth,* 408 U.S. 564, 573 (1972)) (brackets in original). Neither of these scenarios is apparent in the complaint. Plaintiff makes no direct connection between defendants' alleged defamatory statements and plaintiff's termination. Rather, her focus is on the alleged damage to her reputation caused by the publication of articles years after her termination about the management, or mismanagement, of HOPWA grant funds.

Furthermore, in order "[t]o impose liability on the District under . . . § 1983, plaintiff must show 'not only a violation of [her] rights under the Constitution or federal law, but also that the District's custom or policy caused the violation.'" *Feirson v. District of Columbia,* 506 F.3d 1063, 1066 (D.C. Cir. 2007) (quoting *Warren v. District of Columbia,* 353 F.3d 36, 38 (D.C. Cir. 2004)). Recognizing that, "[a]t the pleading stage, only an allegation of the existence of a policy, practice, or custom and its causal link to the constitutional deprivation suffered is required," *Maniaci v. Georgetown Univ.,* 510 F. Supp. 2d 50, 64 (D.D.C. 2007), it is not enough to allege in conclusory fashion, as plaintiff has done here, that defendants' actions were "taken in accordance with [an unspecified] policy, custom or practice." Compl. ¶ 65. Nor can the District of Columbia be held responsible for Catania's alleged unconstitutional actions on a theory of *respondeat superior* or vicarious liability.[6] *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Graham v. Davis,* 880 F.2d 1414, 1421 (D.C. Cir. 1989) (citing *Monell v. Dep't. of Social Servs. of the City of New York,* 436 U.S. 658, 691 (1978)).

---

[6] Moreover, if Catania's actions were outside the scope of his official duties, the District of Columbia could not be held liable on a theory of *respondeat superior*. *See Evans v. District of Columbia*, 391 F. Supp. 2d 160, 169 (D.D.C. 2005). Alternatively, if Catania were acting within the scope of his official duties, he might be protected by the doctrine of official immunity. *See id.*

*C. The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiff's Remaining Claims*

"The district court[] may decline to exercise supplemental jurisdiction over a claim . . . if . . . [it] has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Upon the dismissal of plaintiff's § 1983 claim against the District of Columbia, the remaining claims -- defamation and IIED -- are common-law claims over which this Court does not have original jurisdiction. "[I]n the usual case in which all federal-law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine -- judicial economy, convenience, fairness, and comity -- will point toward declining to exercise jurisdiction over the remaining state-law claims." *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 424 (D.C. Cir. 2005) (quoting *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n.7 (1988)).

The District of Columbia is the only defendant properly served with process over which this Court may exercise personal jurisdiction. The complaint fails to state a claim under § 1983 against the District upon which relief can be granted, and therefore, the District's motion to dismiss will be granted. Catania, Freehill, Klopott and Anderson have not been served, and the Court has no personal jurisdiction over them at this time. Even if service of process had been effected properly, the claims against these putative defendants are not federal claims over which this Court has original jurisdiction. In these circumstances, the Court declines to exercise jurisdiction over the remaining tort claims. *See Redrick v. District of Columbia Dep't of Corr.*, No. 96-7131, 1997 WL 195482 at *1 (D.C. Cir. Mar. 31, 1997) (per curiam) (finding that district court did not err in declining to exercise supplemental jurisdiction over negligence claim after constitutional claims had been dismissed). If Plaintiff wishes to proceed against the individuals she must do so in Superior Court.

## III.  CONCLUSION

The complaint fails to state a claim under 42 U.S.C. § 1983 against the District of Columbia upon which relief can be granted.  Its motion to dismiss will be granted, and plaintiff's motions to amend the complaint and for an oral hearing will be denied.  An Order accompanies this Memorandum Opinion.


DATE:  September 24, 2012                             _____/s/_____
                                                                          ROSEMARY M. COLLYER
                                                                          United States District Judge